Good morning. My name is Gary Laughlin, and I'm here on behalf of Mountain West Holding Co. v. The Appellant. I think the only way that the state's program that uses race and gender-based preferences can be upheld is if it is remedial in nature. And before you can determine if it's remedial in nature, you have to determine whether, as the Western States Paving Company says, and as Carson says, that there has to have any evidence of discrimination in the state, transportation, contracts, or industry. As the factual predicate for the imposition of race and gender-based preferences that's held in the Western States Paving decision, the U.S. DOT, Federal Highway Administration, guides the police to the court in Western States Paving. What do they have to show to be able to show the presence? The guidelines were established by the Department of Transportation. It's not established. So I think we look to the case of Carson. Carson says they have to show either presence or cast discrimination. If it's cast discrimination, the lingering effects of that discrimination has to show government participation. And it has to importantly show, and I quote, deliberate patterns of exclusion. And there has to be a strong basis and evidence to support that, because unless you precisely define what the cast discrimination is, you cannot tailor the remedy to what it is that was necessary to fix it. And we first need to look at what Montana does not have, what they admit that they do not have. They have no legislative to disclose administrative findings of cast discrimination. And Montana admits it has never discriminated in prime or subcontracting. They're not aware of any prime contractor who has ever discriminated in the award of a subcontractor. The federal Western States and associated general contractors from our court talk about being able to use a disparity in statistics to show discrimination and not having to go through all the questions that you're trying to ask. Why not? Because that's what you turn to when you turn toward disparity in statistics if you don't have evidence of discrimination. And if you go to Carson, Carson says that substantial disparity between availability and use, availability of ready, willing, capable contractors could give rise to an inference. Doesn't give rise, but only could give rise to an inference of discrimination. You're referring to the Carson decision the Supreme Court won in 1989? Is that? Yeah. So our cases are since then, right? So our court has talked about what kind of showing is necessary in these cases and has allowed statistical disparity to be the basis for the proof of the prior discrimination, right? If they are valid statistical disparities. So maybe you are arguing, so I think you could jump to that. You have an argument that there are no valid statistics here, but going back and questioning our case law, there's a lot of things we as a three-judge panel can do, I don't think. But we also look at what they relied on. And the state of Montana says we relied on the decrease in DPE utilization when they went from using race-conscious goals to race-neutral from 2006 to 2000. And, again, what's wrong with that is that western states says that the decrease in utilization provides, does not provide any evidence, does not provide any evidence of discrimination. Because when you're looking at a race-conscious program, DPEs get a preference, get an advantage, but lay this out. So the decrease has no meaning whatsoever, no valid evidence. So we look at the Wilson study, which is what they rely on for availability and disparity, and it's flawed. Why is it flawed? Because both western states and the U.S. DOT provides that they have to use a multivariate regression analysis to account for matters other than race or gender that may account for not using a DPE. So you have to use size, capacity, funding, all those sorts of things. And the state has admitted at the record 343 that a multivariate regression analysis was not used. In fact, if you look at the depositions of the woman in charge, Peter Kyle, she had no idea if one was used. If you look at the deposition of the statistician who's responsible, he had no idea it was used. So I can agree with you that the Wilson study was flawed and there isn't sufficient statistical support for what the state did. The state isn't relying on its report or these goals anymore, is it? I'm sorry? The state is not relying on the Wilson report for its current policies, is it? Well, its current policies have abandoned the use of those. We're talking about the period of time from 2011 to 2014 when they did rely on it. Right, so it seems like all you have left is a damageless claim for that period, no equitable claims, none of your ongoing claims are moot. Is that correct? Do you agree with that? We have no claims against them after they discontinued the use of race and gender-based preferences in 2014. And so your claims in your complaint for equitable relief or declaratory relief are now moot, right? The only thing left is your Title VI claim for damages. I'm not so sure that either of them are moot, Judge. I think that to reach the decision of whether the violated Title VII and the Equal Protection Clause you're going to have to declare that the policy that they had enacted, the policy of using race and gender-based preferences was unconstitutional. What do you want to call it? Well, no, we don't do that, in which case the issue is moot. They're not using the study anymore. There's no indication that even if they came back to race preferences, they would use this variable in study at this point, right? So your claims seem to be based on the statistics in the Wilson study, but I don't see how that relates to anything anymore that's still a live dispute, other than your remnant of your damages claim. Correct. This was the New Haven case that they decided from, I want to say Second Circuit, but I may be wrong. New Haven was deciding to use the wrong statistical method in deciding DBEs. After that happened, a person came down, they abandoned it, and New Haven said they're not likely to use the same statistics as their basis. I think part of the problem here is when you read the briefs and you read the understanding of the state, they didn't simply understand that. I don't think they still understand what is required to be constitutional and use race and gender-based preferences. But they're not anymore. So I'm just trying to figure out what's left of this case. So it seems like you have, arguably, if Title VI allows this claim, you have a claim for damages. Yes. Is it just a claim for nominal damages? No, I don't think it's nominal damages at all, because we have evidences of the record that non-West Poland companies submitted quotes for subcontracts. The subcontractor said they were in the low quote. We would have used them, but we had to use the DBE to meet the DBE goals, or we wouldn't get the prime contract. So do you anticipate that if we agreed with you and sent this back, there would be a stridle over whether you actually would have won each of these contracts, and you would ask the state to pay you the money you would have won in those contracts? Is that what this would look like? Yes. Have you tried to settle those claims? Yes. Would it be fruitful to ask you to try again to settle those claims? Happy to try again, but we were not successful in doing that. When was the last time you tried? Prior to the summary judge, I believe it was the mediator. I'm sorry. I had a mood set off the top of my head. I can't tell you what that was. At that time, had the state already stopped using the recent gender preferences? I'm sorry. I don't have the memory of that, no. I'm just wondering if you tried to settle at a time when most of the issues were moot. It seems like now most of the issues are moot, and you have this perhaps very tough, although I see it as damageless issue that you would need to pursue. I'm wondering if you have had settlement discussions in that posture. No, we have not had those discussions since then. I can't remember if at the time we used the mediator, I guess just using the preferences at the time. I just really don't remember. Counsel, let me ask you this. I think I understood what you said, but I'm not sure. Did you say that you think that perhaps there is word of relief, cause of action is not moot because the state has not yet learned what preferences they can and cannot use? Is that what you're saying? Yes. So what you want this court to do is to issue some decision that says you can't do this for purposes of educating the state in the future. Is that correct? That's much like the case that is the northeast Florida chapter of the ATC versus the Jacksonville, which involves the same issue, the DBE program that was abandoned by the state after the lawsuit. It was a case of injunction. It was not seeking marriage. It was a case of injunctive relief. And the Supreme Court said it was not moot that the court could, indeed, issue injunctive relief. This was most likely. Don't forget the standards. Here, I think your claim is based on this old study. I mean, if statistical disparity is enough, then your real claim here is that you have the right statistics. But when we're talking about a report that is never going to be used again, I just don't understand why that's not moot. That's different, I think, than the case you're referring to, where they weren't in the weeds of the math of a report that will never be used again, I don't think. It's the same thing in the city of Jacksonville, which is a belief that they had done a study. It was found to be flaunting. Jacksonville also had an issue of associational standing. But the court said it was not moot because it was capable of repetition. Now, your case turns on the attack on the Wilson study, does it not? It turns on the attack of the Wilson study, and it also turns on other factors in the narrow tailoring analysis, such as the ability to or the failure to use race-neutral alternatives, as Fisher requires, the fact that it includes racial groups that are not found to have been there. Well, but that goes to the validity of the study, does it not? The first part would be the study. The study is not valid. If you had an ideal study, I'm not talking about methods now, but what would be the goal in an ideal study? You'd have to know the availability of contractors, right? Subcontractors. Subcontractors as well as general contractors separated out in discrete form so that you'd know the availability of each. Yes. Then you would have to know the utilization in each of those categories. Yes. And then you would have to know the numbers of firms available in each of the Is that necessary? No, that's absolutely necessary. Yeah. Of course, and then I'm going to post mistakes, because you're dealing with the availability of DBEs who have the capacity already. Well, if you're able to, it doesn't matter. If you have somebody who's a DBE who is. Yeah, I understand. I understand. But what I'm getting at is, where do you think or claim that this Blesen study would have followed, not in methods, but in goals? Do you follow me? Well, you can't determine the availability of DBEs if you don't use the multithreaded regression analysis, because. . . Because methods, not goals, right? Yeah, I'm talking about goals. What do we want to know? We want to know how many are available. Correct. You get there in a lot of ways, right? And you fault them for methods. I'm just trying to get in my mind what is necessary as far as an adequate study to tell us whether or not there was unlawful discrimination or perfectly legitimate preferences. I'm trying to explain it, but I'm apparently not doing it well enough. Let me clarify again. We start with the universe of who is available, which firms are available in the geographical area, in the area from which people will go to the state of Montana. It's going to be unlikely that somebody whose headquarters who has a business in Alabama are going to come in. So you start with the universe of who's available within a geographical area, and then you account for, with the multivariate regression analysis, the availability based upon size, capacity, funding, all of those things to narrow it further. You're not getting the thrust of my question. My question is, what do you want to know? I don't care how you want to know it. I want to know what you want to know. And you want to know availability in discrete numbers of subcontractors, general contractors, how many are available within certain categories of disadvantaged firms. And what else discretely do you need to know? You need to know what is the percentage of work that they should be doing. All right? And that's it. From there, that gives you the goal. And then you have to start the neurotailoring analysis, which includes, does it affect people who are in some parties? Does it include people who are not subject, not in subject to discrimination? Have they, according to Jess Fisher says, used and not been able to achieve the goal through race-neutral methods? All of those are lacking here. It simply isn't there. They include minority groups who were not subject by the Wilson study to discrimination. They did not try race-neutral methods, even though it was recommended by the Wilson study. We go through each year after the recommendation saying, well, we're considering it, we're considering it, we're considering it, and then they ignore it. They never tried it. I'm not sure how you say they didn't try race-neutral methods, because I thought that they had monthly Montana Contractors Association working groups and gathered businesses and quarterless focus groups to discuss how they could increase their capacity and offered business management and record-keeping and financial help and education. How are those not race-neutral? That's exactly what they were doing before. Just because they were doing it before doesn't mean they're not race-neutral attempts to do that. Many of those who are not race-neutral, they were race-conscious. If they're meeting with DBEs, that is a race-conscious method, not race-neutral. The recommendation was to start a small business program to help people begin the businesses to start, and it was lacking that. That's the problem. They didn't follow through with it. They paid over $600,000 for a study and didn't carry through with it. And the problem is, if you don't have a good study, and the anecdotal evidence they rely on, if you look at that, you're supposed to make a detailed, skeptical, non-deferential analysis of the evidence. Well, if they don't have adequate statistical evidence for all constructions, then you can't consider anecdotal evidence. But if you look at the anecdotal evidence, it's lacking. First of all, they claim it comes from affidavits, but the affidavits were never before the court. Affidavits were never given to Wilson's group, were never given to MDT, were never presented to the court. And most of the state says that's not acceptable. If you look at what they're talking about in terms of the anecdotal evidence, they're talking about there's not prompt payment. Well, if you look at the table, the prompt payment is about if the problem is equal to males and minorities. So that's not showing discrimination, plus you have a prompt payment statute in place. Secondly, they talk about we have different standards. Do you want to reserve some of your time here? I'll move on. Good morning. May it please the Court. Counsel. I'm Valerie Wilson. And this is David Oller. And we are here on behalf of the state of Montana. The state of Montana is requesting that this court uphold the district court's November 2014 order for the following reasons. First, Montana has implemented its DBE program in compliance with this court's narrowest tailoring standard announced in Western states, affirmed in Caltrans. And secondly, the district court did not abuse its discretion in finding that Although this case seems and does raise constitutional issues, it seems like it's an easy case to resolve because Mountain West isn't claiming that there is a challenge to the federal program. It's only in Montana's implementation of the federal program. And in that respect, this court on two occasions has very specifically advised Montana what it must do to properly implement the program. There's the two-pronged narrowly tailoring standard set forth in Western states, affirmed in Caltrans, that Montana must show evidence of discrimination in its contracting industry. Not in particular segments of its contracting industry, but as a whole there must be evidence of discrimination in the contracting industry. And the second prong is that the program must not apply to haphazard or random groups, but must only be targeted to those groups that have demonstrated discrimination. And in this case... Your argument basically goes to the waterfront relief issue, right? I'm not talking about the damages. The issue of the title six issue, right? Right. Montana agrees that that's still a lot of controversy. Wait, I want to make sure I understand. What do you agree is still a lot of controversy? The title six damage claim. And you think everything else is moot? Yes, Your Honor. Do you think it would be fruitful to try to settle this damages claim? So, you know, my recollection is that Montana had ceased using contract goals at the time that we went into settlement. It was around October of 2014, shortly before the summary judgment came out, and at that time we were worlds apart on money. So there's really, at this point, Montana believes that there's sufficient evidence to uphold the district court order and that further settlement discussions may not resolve the case. But your defense of the damages claim, assuming we don't agree with what title six, which maybe you'll want to talk about, but if we don't agree with what title six and think there can be a title six claim, then your defense of this damages claim depends on the Wilson study having had adequate methodology, doesn't it? So it does. Your Honor, to support those two prongs, and I just kind of want to go back for a minute because Mountain Wells continues to argue that it's western states plus the Paradise factors. It's western states plus the Fisher factors, and that is not the whole thing. I mean, this is why we agree with you. Okay. You still need the Wilson study to satisfy the western states analysis, I believe. And that's true. And under the Wilson study, there is disparities that are demonstrated. And I just want to point out that the district court's findings were focused on three particular tables, but this case and this disparity study is the exact same methodology that was used for your Caltrans. This doesn't depend. They might have had the same goals, but as I read some of this deposition testimony, they didn't know even what kind of analysis they had done in the state itself so that we can't reconcile your statistics with our numbers. You want to fix this for free? I mean, this thing is kind of a mess. So it may have the same goals, but I didn't even see the Wilson study authors being able to explain what they had done. And this is important to notice. This wasn't a trial perpetuation deposition. This was a deposition called the Mountain West against these particular principles in the Wilson. And both Geoffrey McLean and Deidre Wilson had at least five years between the time that they hit the bow on this disparity study and the time that this deposition was called. So but why wasn't it the state's obligation then to figure out how they had done these statistics? I mean, when they start asking it, it appears there are some problems. There's basically no defense of any of it that I can find to even deferentially defer to. So let me take this one at a time. I really want to talk to you about the availability information because Mountain West keeps saying that there has to be some sort of magical word of multivariate regression analysis, and that is not the case. Whatever the testimony is, the disparity study speaks for itself. With regard to the availability information, this was not a headcount. This was tailored according to the record to account for gross revenues, whether they had. But how did they account for gross revenues? How did they account for gross revenues? Based upon the, there was like a telephone survey of 702 of the firms that do business in Montana, and they took that percentage and calculated gross revenue information. And the idea that the, was there any analysis of whether the people who answered the phone survey were representative of the rest? So there was, and I apologize, but there was some statistical assumptions made. But based upon those telephone surveys, and I want to point this part back to the Coyle construction case where this court found that six to seven affidavits was substantially more than was gathered in the Kripson case, Kripson case, and supported the findings. I'll throw it to you. Are you talking about anecdotes though? So, I mean, are you talking to affidavits about anecdotal evidence? Is that what you're saying? No. And I guess it's an analogy. You're right. But the 702 issue. And do you disagree with the proposition that anecdotes can't be enough? I mean, do you think you could support the whole thing on anecdotes? So what I do, this is what I believe, is that this availability number is accurate. The availability number is not a simple headcount. It was called based upon gross revenues. It was discussed based upon prior bidding history of these companies and whether they had successfully bid or whether they had attempted to bid on highway projects. And it discussed capacity to perform the work. And so this is not a statement. How did this study account for whether the TPEs were newer and less developed and so maybe had less capacity to bid on all the types of contracts that other companies that were more developed might have? It's my recollection that this did take into account capacity in the manner of whether they would be able to bid on more or less than one at the same time. But as Deidre testified in her testimony in the deposition, the capacity is sometimes able to be overcome by hiring more flaggers for a job on traffic control or perhaps hiring some more construction type workers to put up more guardrail. And so they did account for capacity. They did account for gross revenues. And they did consider whether these businesses had done business with Montana or bid on prior projects. Now this study did not focus on availability of discrete groups of disadvantaged contractors, did it? So what this disparity study looked at is it looked at the availability numbers and then it broke it down into Montana, the five districts, and then depending on their availability within the general districts. I think you're saying no. I'm sorry. My question is did this report study and report on availability and capacity of each of the discrete groups who are disadvantaged? No, Your Honor, it does not. Well, the answer to that is no. The answer is no. Did it differentiate between those who did work in the field as opposed to those who did the design and the professional work? It did in the utilization charts. In the utilization? It looked at utilization numbers. Did it look at each group discretely on availability or capacity in the design or professional as opposed to the building? Yes, it did. Okay. And Chapter 6 of that report breaks it down by prime and subcontractor also. Yes, sir. I'm sorry. It breaks it down by prime contractor, by subcontractor, and by construction. My question is groups of disadvantaged people, African-Americans as opposed to Hispanic, did it break it down that way? It did break it down, and it broke it down into disadvantaged groups. There was no dispute in the professional service realm that there was discrimination statistically by underutilization of every discrete group. That's over into decision-making in who would get a building contract. I'm sorry, say again. Did that discrimination that you say was found in the design or engineering spill over into who was selected as a contractor to do work on the field? Yes, it did. Is that legitimate? Yes, it is. It is legitimate under this court's decision in Caltrans. In Caltrans, Associated General Contractors make the same argument. They said that California had to segment the industry into different areas of work. And what this court said is that there was no case that required the state to provide separate goals through DBE participation. That's a different issue. I think you used the disparity in professional services to have a remedy that wouldn't do all services. I don't think that happened in Associated General Contractors, did it? So in that case, what the court said is that we need to look at the totality of the evidence and determine patterns of discrimination. In this case, this disparity study shows patterns of discrimination, not only in professional services, but within Montana's districts, within different segments of the industry, including the construction claims. And those disparities go to the different groups in Montana that have experienced discrimination. Agreeably, there's a question about whether they are discriminated against when you put the results together. But within these districts, with segments of the industry, there are patterns of discrimination. And really, that is why this program is statistically significant, because it wasn't part of the problem, a really small numbers problem, and then even the study noted that these may not be statistically significant. So there was information like that in the study regarding African-American businesses and Asian businesses. But what Montana requires to waive those is to show that Montana can meet its goals without changing the nature of the study. And this court, I would ask that this court take a look at the decision in the Sherbrooke case where the Eighth Circuit said that if there's no better otherwise unreasonable in relying upon these statistics, even though it's small statistics. Has there ever been a response to the criticism that Dr. Lanoue gave, and I think this is what the amicus reached to, about how they compared the proportion of available subcontractors to the proportion of prime contract dollars. So there was a mismatch in what was even compared. And this is an impermissible collateral attack of the federal program, because under the federal regulations, Montana is required to calculate the use utilization based upon total contract dollars. This is not a program where the federal government gives the state of Montana money and says that you can disperse a portion of this contract dollars to a DBE program. It has to be a total of the overall dollars. And the uniform reports that the Western States House presented, I think Exhibit B of its brief, are based upon subcontract dollars and number of contracts. Those methods are off the table for Montana to use and still be in compliance to look at the total number of dollars. But then in availability, don't you need to look at all contracts? And I thought for availability, don't we look at subcontractors? Okay, so excuse. No, actually there are some. There are DBE. When we look at the firms, the DBE availability, in the utilization study, the Wilson study took into account some larger firms that are prime contractors that are owned by Native Americans, that are owned by women, that do receive large contracts. And that utilization number, they were included in the utilization number, even though they weren't small businesses, because they were women and minority-owned firms. Their usage and their utilization was counted in favor of Montana using Native and women-owned businesses. Can I ask you a basic question? This is a granted question, but I'm not sure there's any judgment there. Yes. Okay. Now we've been arguing for the last 15, 20 minutes about the validity of the study, right? Whether or not it was properly done. Factual issues, yes, sir. So those are factual issues, right? So they are factual issues. Am I right? They're factual issues, right? The ones we're arguing today, yes, sir. And when we're looking at the granting of a motion for summary judgment, we're looking at facts that lie most favorable to the non-probative party, right? That is true. So why is this not a case that should go to a jury or to a court to try on facts rather than on that? And this is a great question, because what Mountain West has done is they have attacked this study. And really, on the other side, first of all, the evidence that was presented to the district court, it's our contention that it was improperly admitted because it was not authenticated and should not have been considered by the court. But even if the court did not err in admitting it and considering this evidence, there were only two pages out of the 184-page report that were cited by Western states to defend these arguments. So this argument about the mismatch between contractors and subcontractors, they made the arguments about there not being proper statistics. They made these arguments whether they cited pages or not. And I don't see, even in your response, the district court really a response. But maybe you have a response. But it has not a fact dispute that the district court really needed to resolve. That's a fact dispute. The district court doesn't even engage with it in the opinion we have. So what the district court found is that Montana West required to segment the industry. And under the Caltrans case, kind of looking at the evidence in its entirety, you hear there was strong evidence, even setting aside the disputed combined category, there was strong evidence that was undisputed, that there was discrimination in every category of professional services. There was undisputed evidence, anecdotal evidence, including the good old voice numbers. I think it was disputed because it all depends on the availability. And you can't get to the percentages without the availability numbers being right. And they were saying that the entire methodology of the survey and everything of getting the availability was messed up. And what the district court found is that their arguments were not supported by facts. Because facts are what is in the disparity study. And the disparity study was not a head count. It was not a western states kind of a head count. It wasn't a croissant kind of a head count. I have an expert, and I'm not sure you do. I mean, if we disagree with you about what the experts have admitted, why isn't there at least an expert dispute? I'm not sure you have an expert. But giving up the benefit of the doubt, there's at least an expert saying, oh, that's not right about how these statistics were done. So the disparity study, again, the court found that it spoke for itself, that the argument that it was a head count and it wasn't a custom census. Because custom census is similar to what was accepted by this court in Caltrans. It was the custom census, similar to what was accepted by the Seventh Circuit in northern contracting, and also the Eighth Circuit in the Sherbrooke case. It's that custom census that looks at capacity, gross revenue, and ability to bid on contracts. And this is not a matter of just all the DBEs available in Montana were not thrown into a pool and come out of these bill of liability numbers. Their argument is not supported by the facts. So that's all true. Why did you stop using the head count? That's such a great question. So every three years, Montana has to review its goal methodology. And so because of dependency in this case, Montana has actually reviewed its goal methodology twice since then. The first time based upon just the expiration of the three years of the goals. And then because of the age of the disparity study, again, it was time to do a new disparity study. So the discontinuation was not similar to Jacksonville. It wasn't a voluntary cessation. So then the issue is not moved. So the fact that you've discontinued using the study as a basis for your DBE program, the issue is not moved. So the issue, no, I don't quite understand your question. But since the Montana could still go back and rely on this particular study. So, no, Montana could not rely on this particular study because the evidence in the new study that supports the new goals is the basis of the current DBE goals and its goal methodology. And under the federal statute, Montana is required to use the newest disparity study information in setting the goals in order to comply with the FHWA rules. So just briefly. Judge Levy has another question. Yes. Your reference to a whole bunch of affidavits assembled by an author someplace where in the Midwest or someplace that are not available. What's going on? So in the, and this is not an usual methodology. And I guess I touched on this earlier that this court has found that anecdotal evidence does not have to be verified. I'm not talking about anecdotal evidence. I'm talking about the affidavits themselves. They're in the hands of some law firm someplace. And what do you use, the summary of them or what? Yes, it is summarized in the chapter 7. The originals. The agreement with the disparity, with the Wilson Group, with the individuals that submitted their affidavits is that those will be kept in, it was a law firm that's keeping them. And the idea is that they would have the independent verification. But the idea is that the disadvantaged firms would not be afraid that that information could be used against them in some manner. So was there an agreement to keep it away from the court? Keep it away from the state of Montana. Keep it away from the state of Montana? Yes, sir. Okay. Montana has not seen those. Can I ask you one question that relates to your Title VI argument? Yes. What is the order in which you get your program approved and when you get the funding? Can you tell me how the timeline works with that? Again, every three years we have to have a legal methodology that is approved by FHWA, and that is the DOT branch that takes into account if we are properly following the regulations. And what happens is our federal funding will come in, and it's dependent upon the approved plan. So every three years it's not like our funding stops. But if Montana is unable to get its program approved in compliance with the regulations, then its funding is in jeopardy of being cut off. Normally we don't get all of our funding at one particular time of year. But the funding is flowing in sort of continuously, but every three years you get some sort of approval? Yes, and the funding comes in as the projects are let. Once the Montana Highway Commission lets a project, FHWA will respond to that and we'll begin on right-of-way and construction, planning, engineering. And just really quickly with regard to the Title VI, it's Montana's position that the Title VI, the district court's finding that the implied private right of action to the corporation to violate the Pennhurst Clear Statement Rule is in error. And if the court does find against Montana on the November 2014 order, we would ask that the court look at the Title VI argument. It's also true that Montana has completely complied with all the federal regulations and the statutes that are enabling the funding. In fact, the Title VI regulations incorporate the DBE Highway Department regulations. And so by reference, Montana is not only in compliance with the DOT regulations, but also the DOJ regulations on Title VI. And so it's just anomalous for Montana to be held to a standard by a third party, even if Mountain West is a third party beneficiary under Title VI. It's anomalous that the government could not take any action against Montana because we're in compliance with its rules, and yet be subject to liability for the government that didn't evaluate the Wilson study today. As Mountain did, it was part of the methodologies that need to be reviewed. And so the DOT branch, FHWA, reviews, do we have any evidence they actually do, or do you just send them your things and you keep getting your money? And is there anything where they actually said this Wilson study meets all the methodology that it needs to? So, no, it's just their approval of the goals. That's all that's in the record. Thank you. That's good. You can do overtime. Okay, thank you. We'll give you two minutes for rebuttal. Thank you. Western states has already held compliance with federal regulations does not insulate and has plotted an attack based upon unconstitutionality. Are you going to judge me for a question about questions of fact? In summary judgment, the question is facts are not in dispute. It's a matter of law, as I put it. The law is very clear that for a disparity study to pass the Constitution muster, it has to use a multivariate regression analysis. The state admitted. So, are you saying that because, as I recall, you filed a summary judgment motion as well, right? Yes. So, what you're really saying is we should reverse the firm, reverse the state, and grab ours.  Yes. That's good. Okay. I've got it right for us. So, what about remanding because it's not so messed up. It's not such that they have admitted they did not use what is required, the multivariate regression analysis that's required by the Western states, that's required by Corsica, and that's required by the federal guidance that was given in the 6th Amendment. If they didn't do that, we don't have factual accreditation that way. The study is wrong. The other thing I do have to argue is that the narrow tailoring analysis, the six-factor test, does apply. If you go back and you read Western states, Judge O'Scalla went through, mentioned Paradise, went through a six-factor test, specifically identifying each of what they were. He then dealt with two and found that this was constitutional. Caltran acquiesced. Caltran was wrong. The reason it's wrong, as Caltran said, and the court does not have to consider they don't admit this, they just have to prove that they tried race-critical methods first. A couple months after the Caltran decision came out, the United States Supreme Court in Fisher said, strict scrutiny imposes the ultimate burden of demonstrating, before turning to race classifications, that race-neutral alternatives did not suffice. That's directly contrary to what the Ninth Circuit said. The Ninth Circuit panel was wrong. It was also dictative. I'm just going to ask about that. It really wasn't necessary. The court's ruling in the Caltran's case, right? It was decided based upon associational standing. Once they said it was not standing, they should not have gone forward with it. That was the decision that they went on, and it was wrong because what the Supreme Court said in Fisher, that's pretty strong language from the Supreme Court as to what it was. The other thing is, when you look at them, when you look at the NeuroTailoring, they include in the racial preferences, groups that did not suffer discrimination, according to their own study. That, according to NeuroTailoring, the Western States and the Latin Crescent, is over-inclusiveness, which doesn't indicate it's illegal, because you're not remediating anything. That's what we come back to. This has to be remedial. They didn't know what they were remediating because they didn't have the correct study, so you can't fix it if you don't know what it is. That's what this case really is about. The importance of it, the judge will have just criticized a project, but when you look at the language that are used by the courts in dealing with these constitutional issues of equal protection, they use words that really have a great impact. In the distinctions based upon access, they are odious to the free people. They are inherently suspect. They are presumptively invalid. You have to make a search and examination. Script is script. Thank you. We have your argument, and that was in your briefs as well. Thank you. Both sides, for your helpful arguments, the case is submitted, and we are adjourned for the week.
judges: Leavy, Friedland, Benitez